IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 16 CR 462-14 |
| ) | Judge Rebecca R. Pallmeyer |
| ANGEL VILLAGRANA ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER AND
COMMENTARY ON SENTENCING FACTORS**

Defendant, **Angel Villagrana**, by and through his attorneys, the **Law Office of Damon M. Cheronis**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits his clarifications and objections to the presentence investigation report (hereinafter "PSI"); and position paper and commentary on sentencing factors. For the reasons that follow, Mr. Villagrana, through counsel, requests that this Court impose a below guidelines sentence.

**I.**     **Introduction**

In fashioning an appropriate sentence for Mr. Villagrana, this Court is faced with a truly unique challenge. A challenge, no doubt, because rarely, if ever, is the Court required to take into consideration such an extreme set of competing circumstances. On the one hand, the offense conduct is undeniably serious. Gang violence has been and continues to be one of the most serious problems facing our city. On the other, this Court will be sentencing a remarkable young man who found the strength and courage to voluntarily leave the Latin Kings, despite full awareness of the risks and repercussions of doing so. Indeed, this story is at once the story of a young, Hispanic man who grew up in near-poverty, in an almost impossible situation on the rough streets of Chicago's Far West Side, and who, as a teenager, gave in to the easier, regrettable path that gang membership presents. But it is also the story of a young man, who, despite growing up in a set of circumstances tougher than most can scarcely imagine, he made the choice that we as a society hope all current gang members will make—to find a way out, to get back in school, to find a job, or otherwise rejoin society as a positive, productive member. As such, to the extent this Court seeks to impose a sentence at or remotely near the advisory guidelines range as punishment for the offense conduct, and in so doing send a message to society that such conduct will not be tolerated, it risks sending the opposite message—become a gang member, and the justice system will forever treat you accordingly.

In any event, when Mr. Villagrana appears before this Court to receive his sentence, it will be the most difficult day of his young life. As for the specific actions that Mr. Villagrana undertook to bring himself before the Court on that day, he can only say that he is deeply and profoundly sorry. Yet no one deserves to be judged solely based on the worst things that they have ever done. Fortunately, in our post-*Booker* world, Mr. Villagrana finds himself before a court that has the

authority to fashion a just and appropriate sentence that considers the advisory guidelines as only one amongst many factors. Based on Mr. Villagrana's commendable life choices over the past couple years, and all the other unique circumstances discussed herein, counsel submits the only just and appropriate sentence is a well-below guidelines sentence.

II. Clarifications and Objections to the Presentence Investigation Report

    A. Offense Level Computation, p. 11 ¶ 61: Clarification Regarding the Combined Offense Level

In performing the Chapter 3 grouping analysis, the PSI initially concluded that a two-level upward adjustment was applicable based on the existence of two units, which, in turn, was the result of two separate groups containing equally serious offense levels. (PSI, p. 11, ¶ 61). In its version of the offense ("Government's Version"), the government takes the position that a three-level upward adjustment is appropriate in determining the offense level because there are three distinct, equally serious groups. (*See* Government's Version, p. 17). After the sentencing of co-defendant Ulises De La Cruz, on August 10, 2017, the probation officer issued a supplemental report in which it relied in part on *United States v. Garcia*, 754 F.3d 460, 484-85 (7th Cir. 2014) to conclude that a three-level upward adjustment was ultimately appropriate based on the existence of three distinct groups. Counsel does not dispute the propriety of the government's grouping analysis and the position ultimately arrived at by the Probation Office. Therefore, the combined offense level is 36, and when adjusted for Mr. Villagrana's affirmative acceptance of responsibility, and timely notification of his intent to plead guilty, the total offense level is properly calculated as level 33.

B. **The Defendant's Criminal History, p. 12, ¶ 74: Clarification Regarding Mr. Villagrana's Criminal History Category**

The PSI and the government also take differing positions regarding Mr. Villagrana's criminal history score. The dispute centers on how many criminal history points are properly attributed to a 2012 juvenile arrest for aggravated unlawful use of a weapon, which occurred when Mr. Villagrana was 16-years-old. The PSI notes that on June 14, 2012, Mr. Villagrana admitted his guilt to this offense. (PSI, p 12 ¶ 74). The PSI also states that Counts 1 through 3, the Aggravated "UUW" counts, were then dismissed, and further information has been requested from the Maywood Police Department, but no information has yet been received. (PSI, p 12 ¶ 74). Further still, on July 19, 2012, Mr. Villagrana was sentenced to 18-months' probation, which included the conditions that he complete 30-hours of community service and participate in a Treatment Alternatives for Safe Communities ("TASC") evaluation. (PSI, p 12 ¶ 74). That probationary period was terminated satisfactory on January 13, 2014. (PSI, p 12 ¶ 74). Pursuant to § 4A1.2(a)(1), and ultimately as a result of finding this conviction to amount to relevant conduct, the PSI does not attribute any criminal history points to Mr. Villagrana as a result of this disposition.

The government, however, attributes one criminal history point to Mr. Villagrana for this disposition pursuant to § 4A1.2(d)(2)(B). It then takes the position that two additional criminal history points should be added pursuant to § 4A1.1 because part of the instant offense was committed while Mr. Villagrana was under a criminal justice sentence from that offense, namely, probation.[1] (Government's Version, p. 17).

---

[1] In the event the Court agrees with the government, given that the factual allegations for this arrest are so closely intertwined with the offense conduct, it should nonetheless give even further consideration to imposing a below-guidelines sentence under 18 U.S.C. § 3553(a).

4

The PSI is correct. § 4A1.2(a)(1) defines a "prior sentence" as "any sentence previously imposed upon adjudication of guilt . . . for conduct not part of the instant offense." A sentence that otherwise would be considered a "prior sentence" for criminal history purposes is instead to be considered part of the instant offense if it qualifies as relevant conduct under § 1B1.3. *United States v. Nance*, 611 F.3d 409, 413 (7th Cir. 2010) (citing U.S.S.G. § 4A1.2 cmt. n. 1). In this matter, the PSI suggests that Mr. Villagrana's February 27, 2012 arrest was related to an incident where he was performing security for the Latin Kings. (PSI, p. 12, ¶ 74). In his plea declaration, Mr. Villagrana admitted to being a Latin King member beginning in or around the summer of 2012. As such, the sentence and underlying conduct related to the February 27, 2012 arrest would more properly be considered relevant conduct pursuant to § 1B1.3(a)(1). Assuming counsel and the PSI are correct then, Mr. Villagrana does not have any criminal history points and qualifies for criminal history category I.

**C. Guidelines Calculation**

The PSI submits that Mr. Villagrana's total offense level is 33, which when combined with a criminal history category of I, results in an advisory guidelines range of 135 to 168 months' imprisonment. The government submits that the correct offense level is 33, which when combined with a criminal history of category II, results in an advisory guidelines range of 151 to 188 months' imprisonment. Counsel agrees with the PSI and the government that the correct offense level is 33, but only the PSI that Mr. Villagrana is properly placed in criminal history category I, and thus his advisory guidelines range is properly calculated as 135 to 168 months' imprisonment.

5

**II.** **Position Paper & Commentary on Sentencing Factors**

 A. Introduction

  This Court is certainly well aware of the nature and circumstances of the offense given everything the government has and will continue to present in this matter. The conduct that Mr. Villagrana has pled guilty to is no doubt a serious offense. But all of that evidence, everything put forward in the PSI, in the Government's Version, and anything the government intends to put forward at the sentencing hearing itself, is of course only a portion of what must be considered before this court issues a just and appropriate sentence. Because on the day of the sentencing hearing, this Court will not simply be meting out social retribution for a serious offense; rather, it will be charting the course for the rest of Mr. Villagrana's life. In short, this Court will not simply be punishing the alleged conduct, but it will be sentencing an individual—and a remarkable one at that.

  As the highly respected former district court judge Nancy Gertner has stated in the context of career offenders, "there are career offenders and there are career offenders." *United States v. Whigham*, 754 F. Supp. 2d 239, 247-48 (D. Mass. 2010). The same can be said here: there are latin kings, and then there are Latin Kings. Counsel suspects that even the government would agree that Mr. Villagrana ceased being a Latin King years before the indictment issued. There is no question that Mr. Villagrana's dissociation with the Latin Kings was genuine, and not some contrived *ex post facto* attempt at mitigation. Suffice to say, he left for all the right reasons. And this is an individual no less, who as will be described further herein, has been afforded no breaks, given little opportunity, and faced more difficulties than most could imagine.

6

Thank goodness, then, that Mr. Villagrana finds himself in a post-*Booker* world and before a court that has the authority to fashion a just and appropriate sentence. Indeed, as this Court is no doubt well aware, since *United States v. Booker*, 543 U.S. 220, 264 (2005), the applicable guidelines range has been advice this Court should consider but is not required to follow. But even as advice, the guidelines may be flawed and are not to be presumed reasonable. *Nelson v. United States*, 555 U.S. 350, 351 (2009) ("[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable").

Nevertheless, the guidelines remain a "starting point" and "initial benchmark" for this Court to consider in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007). As this Court is also well aware, per *Gall*, before determining which sentence is just and ultimately "sufficient but not greater than necessary to achieve the purposes of sentencing," it must consider all of the § 3553(a) factors. As mentioned, counsel submits that the advisory guidelines range is properly calculated as 135 to 168 months' imprisonment, although depending on which party is ultimately correct, that range may be as high as 151 and 188 months' imprisonment. But for all of the reasons described herein, counsel respectfully submits that, after considering the guidelines as a "starting point" and "initial benchmark," the just and appropriate sentence in this case is a well-below guidelines sentence.

      B.      **The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))**

This Court is certainly well aware of the nature of the instant offense. Mr. Villagrana has pleaded guilty and acknowledged that he has committed a serious crime. But there are two aspects of the offense conduct that the Court should take specific note of, each with respect to the timing of the offense.

First, for a significant portion of Mr. Villagrana's participation in the conspiracy, he was but a minor, or otherwise only barely past the age of maturity. On May 26th of this year, the Sentencing Commission issued an extensive study on youthful offenders in the federal system, which examined in particular the intersection of neuroscience and the law.[2] It noted that the prefrontal cortex is the part of the brain utilized in impulse control, emotional reactions, executive decisions, and decision making, and the last part of the brain to develop. *Id.* at p. 6. During adolescence and into young adulthood, this part of our brain goes through processes known as synaptic pruning and myelination. *Id.* Simply put, these processes do not generally reach completion until humans enter their mid-20's, and people at different stages of these processes have different brain structures and functioning compared to fully-functional adults. *Id.* The use of marijuana and alcohol can further compound this process. *Id.* While guarding against over-generalization, the Commission concluded that the results of many recent studies "indicated clear differences in the ways the frontal lobe was used in decision making" for minors and young adults. *Id.* at p. 7. For those reasons, counsel submits that Mr. Villagrana's youth, coupled with his substance abuse, is an important fact not because it eschews responsibility entirely, but rather it is nonetheless something this Court should remain cognizant of in assessing the precise degree of Mr. Villagrana's culpability. *See Thompson v. Oklahoma*, 487 U.S. 815, 816 (1988) (recognizing that juvenile offenders are less culpable due to less education, experience, intelligence, and increased peer pressure).

Second, and likely the most important point counsel will make in the course of this memorandum, sometime in the calendar year 2015, Mr. Villagrana fully, completely, and voluntarily

---

[2] *See* United States Sentencing Commission, *Youthful Offenders in the Federal System* (May 26, 2017) *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

8

severed all ties with the Latin Kings organization. "Voluntarily" in the sense that he made this decision for all the right reasons. He was not indicted until July 21, 2016. (*See* Dkt. # 4). He was not approached by law enforcement or otherwise had any knowledge of a pending investigation prior to his arrest. He made this decision because he wanted a better life for himself—a normal life, a productive one—away from the guns, drugs, and violence associated with serving as a foot soldier for the Latin Kings.

And while Mr. Villagrana did not know what federal law enforcement agencies were up to at the time he left the Latin Kings, he certainly did know exactly what the gang itself has in store for potential runaways like himself. As the government notes in its version:

> The Latin Kings also protected themselves and their power by issuing standing orders to shoot (also known as "SOS" orders) and beat all rival gang members and "runaways," and by ordering "burns," "hits," and "missions," which were one-time orders to shoot and beat rival gang members and runaways. Defendant VILLAGRANA knew and agreed that Latin King members, when necessary to advance the purposes of the Latin Kings, did in fact shoot, attempt to murder, and physically harm rival gang members and "runaways."

(Government's Version, p. 6). In other words, Mr. Villagrana knew full well that by abandoning the gang, its lifestyle, and all its baggage, he was not only risking his physical well-being in the form of a short, albeit severe beating, but he was risking his very life. Whether that fact weighs most heavily on the Court's consideration of the offense conduct, the need to afford adequate deterrence, or protect the public from ostensible future crimes of Mr. Villagrana, its significance cannot be overstated.

9

**C. History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))**

*i. Mr. Villagrana's Difficult Upbringing*

By any measure, Mr. Villagrana has dealt with more difficulties and hardship in his young life than most can scarcely imagine. Mr. Villagrana's parents were very young when his Mom gave birth to him and his younger sister, Aliyah. (PSI, p. 15 ¶ 88). Mr. Villagrana describes his childhood as "tough," in part as a result of the family's financial struggles, which required the family to frequently move around. (PSI, p. 15 ¶ 88). Mr. Villagrana was raised primarily in Maywood and Melrose Park, but he also spent a period of time residing with his grandparents in Wheeling, Illinois. (PSI, p. 15 ¶ 88). Indeed, financial struggles were a constant theme throughout his childhood. His mother suffers from bipolar disorder, which made it difficult for her to maintain steady employment. (PSI, p. 15 ¶ 88). His parents frequently argued about finances, and at one point, the financial situation became so dire that his family lost their home to foreclosure. (PSI, p. 15 ¶ 88). Owing in part to these difficulties, Mr. Villagrana did not receive an adequate education, had a difficult time maintaining employment throughout his early youth, and ultimately, he fell in with the wrong individuals, a mistake that eventually brought him before the Court in the instant matter.

*ii. Mr. Villagrana's Struggle with Addiction*

As a result of his tumultuous childhood, Mr. Villagrana developed substance abuse problems. As the PSI reports, Mr. Villagrana first began drinking at the age of 16, around the time he first joined the Latin Kings, which was also the same year he first used marijuana. (PSI, p .18 ¶ 100). Between the ages of 16 and 18, Mr. Villagrana drank heavily, sometimes to the point of blacking out. (PSI, p. 18 ¶ 101). Since the age of 16, Mr. Villagrana smoked marijuana several times a week up until the date of his arrest. (PSI, p. 18 ¶ 101).

Mr. Villagrana has had some success with treatment programs. Shortly after his arrest, he received treatment at Pillars in Hickory Hills, Illinois, where he exhibited symptoms consistent with Cannabis Use Disorder and Early Remission. (PSI, p. 15 ¶ 102). Mr. Villagrana personally reports benefitting from that treatment. (PSI, p. 15 ¶ 102). While neither counsel nor Mr. Villagrana would blame his actions on his frequent state of intoxication and substance abuse generally, it must be noted that the criminal conduct at issue was not undertaken by an individual acting with the same judgment and control as a sober individual. As such, counsel and Mr. Villagrana agree that a recommendation for drug treatment would be an appropriate recommendation during any period of incarceration ordered, as well as the period of supervised released imposed.

### iii. Mental Health Concerns

Mr. Villagrana's long, documented history of serious mental health concerns also counsels in favor of a below-guidelines sentence. As the PSI reports, Mr. Villagrana has suffered from mental and emotional health problems since the age of 12. (PSI, p. 17, ¶ 97). These problems may have emerged as a result of rising tensions and constant quarreling that took place between him and his father as Mr. Villagrana entered his teenage years. (PSI, p. 17, ¶ 97). Later, still sometime in his youth, because of his then-girlfriend's miscarriage, Mr. Villagrana began having mood swings and anger management issues. (PSI, p. 17, ¶ 97). Mr. Villagrana was subsequently hospitalized at Linden Oaks Behavioral Health in Naperville, Illinois for approximately one and a half weeks. He further recalls being prescribed Alprazolam and clonazepam, participating in counseling, and receiving other forms of treatment that proved helpful. (PSI, p. 17, ¶ 97). Mr. Villagrana's mother further reported to the probation office that Mr. Villagrana started experiencing anger management issues as a result

11

of the family's constant relocation during his youth. (PSI, p. 17, ¶ 97). His mother believes that he was also prescribed Xanax to help him cope with these issues. (PSI, p. 17, ¶ 97).

After his arrest, in addition to drug treatment at Pillars, Mr. Villagrana has received additional mental health counseling, which has thus far proven beneficial. When Mr. Villagrana first arrived at Pillars, he underwent a mental health assessment and reported a history of "anxiety," "stress," and "moments of feeling down" since the age of 15. He further reported that his grandmother, mother, and sister have all been diagnosed with bipolar disorder, and he himself further exhibited symptoms consistent with Generalized Anxiety Disorder and Unspecified Depressive Disorder. (PSI, p. 17, ¶ 98). Mr. Villagrana is not currently taking prescription medication but instead has been focusing on meditation as a form of relaxation treatment. (PSI, p. 17, ¶ 98). His therapy sessions are ongoing, as Mr. Villagrana has found it helpful, and further, he has expressed a willingness to continue with treatment, should it be court-ordered. (PSI, p. 17, ¶ 98).

### iv. Mr. Villagrana's Decision to Turn His Life Around.

As noted, Mr. Villagrana's decision to leave the Latin Kings was an entirely voluntary one, arising well before the indictment issued or he had any notice that there had been an investigation into the Latin Kings. A similar situation was presented the Supreme Court of the United States in *Gall* itself. There, after the Court of Appeals criticized the district court for granting too significant a variance based on the defendant's voluntary withdrawal from a conspiracy, the Supreme Court stated the following:

> [The appellate court's] criticism is flawed in that it ignores the critical relevance of Gall's voluntary withdrawal, a circumstance that distinguished his conduct not only from that of all his codefendants, but from the vast majority of defendants convicted of conspiracy in federal court. The District Court quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding, on his own initiative, to change his life. This lends strong support to the District

12

> Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society. Compared to a case where the offender's rehabilitation occurred after he was charged with a crime, the District Court here had greater justification for believing Gall's turnaround was genuine, as distinct from a transparent attempt to build a mitigation case.

*Gall*, 552 U.S. at 56-57. Above and beyond the defendant in Gall, Mr. Villagrana's rehabilitation did not start and end with him voluntarily refraining from taking further negative actions; rather, in addition to leaving the gang, Mr. Villagrana took affirmative steps to advance his career and become a productive member of society. In 2014, Mr. Villagrana began working as a Subway Restaurant outlet in Northlake, Illinois. He has continued to maintain steady employment to this day, even rising to the rank of manager.

His boss, Eva Saliu, who is also the owner of the store in which Mr. Villagrana works, has specifically written this court to describe how Mr. Villigrana is "trustworthy and responsible." (Letter from Eva Saliu). Eva further describes Mr. Villagrana as polite, respectful, honest, reliable, and well-liked. (Letter from Eva Saliu). Eva specifically notes an incident where after Mr. Villagrana found a wallet outside the store containing a significant amount of cash, he not only ensured that the wallet was returned to its rightful owner, but outright refused to accept any reward or compensation for doing so. (Letter from Eva Saliu). Eva also notes that after Mr. Villagrana serves whatever sentence the Court sees fit to impose, he will "always be welcomed back" into her store. (Letter from Eva Saliu).

### v. Mr. Villagrana's Personal Character

Despite all the difficulties Mr. Villagrana has endured throughout his life, one would not know it from sitting down and having a conversation with him, as he is undeniably a kind, compassionate, positive individual; no less one with a good head on his shoulders and the right

13

outlook for the future. While counsel has had the good fortune to observe these qualities first-hand, the letters submitted to the Court by Mr. Villagrana's family and friends—those who know him better than anyone—do a better job describing these characteristics than counsel could ever hope to.

Mr. Villagrana's mother, Llesenia Rodriguez, describes him as a "loving brother" who "always puts his family first." (Letter from Llesenia Rodriguez). On that point, Llesenia took the time to thank the Court for issuing a bond in this matter, because while on pretrial release, Mr. Villagrana used his time working to help support his family by assuming some responsibility for the rent and other bills. (Letter from Llesenia Rodriguez). Without Mr. Villagrana's support, Llesenia notes that the family very well could have become homeless. (Letter from Llesenia Rodriguez). She further notes just how tragic this situation is, as "[t]he same people [her] son was avoiding may now end up in a cell with him." (Letter from Llesenia Rodriguez).

Prisma Romero, Mr. Villagrana's fiancé, with whom he has been in a relationship since 2008, first describes how she is working as a Certified Nurse's Assistant and will be attending Nursing School this fall. (Letter from Prisma Romero). Prisma notes that Mr. Villagrana has been her "biggest support system through school" and that he motivates her and urges her to pursue her dreams. (Letter from Llesenia Rodriguez). She describes Mr. Villagrana as "honest, kind, hardworking, and a dedicated family man." (Letter from Llesenia Rodriguez). Prisma specifically notes that Mr. Villagrana would go out of his way to feed a homeless man who would frequent his store, often giving the man his employee shift meal. (Letter from Llesenia Rodriguez). Prisma further notes that after this matter is resolved, the two want to "finish school, get married purchase [a] home, and hopefully start a family." (Letter from Llesenia Rodriguez).

14

Mr. Villagrana's younger sister, Aliyah, writes to describe Mr. Villagrana's selfless willingness to help support his family while his Mom was out of work. Movingly, Aliyah notes that Mr. Villagrana has "worked hard to make up for his mistakes and [they] were devastated to hear that after how much he has changed, his mistakes sadly still clawed into his present." (Letter from Aliyah Villagrana). Despite these harsh circumstances, Aliyah observed that her brother is "still working hard at his job and working to not be known for his past and known for who he is today." (Letter from Aliyah Villagrana).

Many other members of Mr. Villagrana's family and friends write to echo this sentiment. As Jessica Castellanos, Mr. Villagrana's cousin, opines, "[Angel] serves his purpose in this community . . . I hope that when you look at Angel you can see that he is accountable for his actions." (Letter from Jessica Castellanos). Iris Casas, another one of Mr. Villagrana's cousins, writes to the Court to describe how Mr. Villagrana has learned from his mistakes, has shown the "different character" of a "new person" of late, and has shown "great morals [in] going to work, spending time with family, as well as focusing on going back to school. (Letter from Iris Casas). Sandra Rodriguez, Mr. Villagrana's godmother, describes Angel's maturation process, specifically noting that as "he has been becoming older I knew that he was changing for the better and turning his life around." (Letter from Sandra Rodriguez).

The foregoing is but a sampling of Mr. Villagrana's character and devotion to his family and friends as revealed by those closest to him.

### D. A Below Guidelines Sentence Will Be Sufficient to Comply With the Factors Set Forth in 18 U.S.C. § 3553(a)(2).

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient,

15

but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

As an initial matter, counsel has already indicated that both Mr. Villagrana and his lawyers feel drug treatment would be an appropriate component of any sentence ordered. But also in weighing the sentencing goals set forth in § 3553(a)(2), this Court should consider the arguments put forward by Judge Posner in a fairly recent opinion, *United States v. Presley*, 790 F.3d 699 (7th Cir. 2015). In *Presley*, Judge Posner implored sentencing courts to reconsider just how much deterrence an additional length of incarceration provides, and the wisdom of fashioning such lengthy sentences. More specifically, Judge Posner relied on emerging academic literature in the field of economics, citing what economists call the "discount rate." *Id.* at 701. According to that theory, "[c]riminals . . . tend to have what economists call a 'high discount rate'—that is, they weight future consequences less heavily than a normal, sensible, law-abiding person would." *Id.* In other words, the length of a sentence has less of a deterrent effect on such an individual than "the likelihood that he will be caught, imprisoned, and convicted." *Id.* Thus, "[a]n increase in the length of a sentence may therefore add little additional deterrence, since every sentence increment is an increment in future, not present, punishment." *Id.* By Judge Posner's logic then, sentencing Mr. Villagrana to a lengthy term of imprisonment at or near the advisory guidelines range would provide little additional deterrence than the sentence counsel requests. *See also United States v. Poke*, 793 F.3d 759, 761 (7th Cir. 2015) (reiterating the *Pressley* opinion's concern with the limited added deterrence effect of a lengthy

16

sentence in light of the "discount rate"). Judge Posner's logic is blunted here only by the fact that counsel has already belabored—specific deterrence is a non-issue for Mr. Villagrana as he voluntarily straightened out his life well before his arrest in this matter.

**III.   Conclusion**

In light of the ruinous, life-changing consequences that would result from a guidelines sentence of 135 to 168 months' imprisonment, a guidelines sentence cannot be described as sufficient, but not greater than necessary—it is overly severe. Fortunately, in our post-*Booker* world, this Court has the ability to fashion a sentence not only below what in this case is an overly severe guidelines range, but *significantly so* at that. And Mr. Villagrana is a man who despite any of his transgressions and failures, does not deserved to be judged solely based on the offense conduct. Accordingly, Mr. Villagrana, through counsel, respectfully requests that this Court impose a below guidelines sentence.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/Ryan J. Levitt
**Ryan J. Levitt,**
Attorneys for Defendant.

**Law Office of Damon M. Cheronis**
140 S. Dearborn Street Suite 411
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com
ryan@cheronislaw.com

**CERTIFICATE OF SERVICE**

I, Ryan J. Levitt, hereby certify that on November 21, 2017, I electronically filed the foregoing **Defendant's Clarifications and Objections to the Presentence Investigation Report and Position Paper and Commentary on Sentencing Factors** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

                                                   s/ Ryan J. Levitt
                                                   Ryan J. Levitt
                                                   Law Office of Damon M. Cheronis
                                                   140 S. Dearborn Street Suite 411
                                                   Chicago, Illinois 60603
                                                   (312) 663-4644
                                                   ryan@cheronislaw.com