UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 16 CR 462 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| ANGEL VILLAGRANA aka "Shy," | ) | |

**GOVERNMENT'S OBJECTIONS TO THE PSR AND RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

Over the course of no less than four years, the defendant and his co-conspirators terrorized the citizens of Maywood and Melrose Park and caused incalculable physical and psychological damage to the residents of these communities, as well as other communities in the Chicagoland area. Over the course of no less than 4 years, the defendant repeatedly chose a lifestyle that included threats and acts of murder, arson, assault, and extortion. A lifestyle that promoted violence, fear, and intimidation.

Because of the defendant's conduct, the defendant was charged, along with fourteen co-defendants, with RICO conspiracy, in violation of 18 U.S.C. § 1962(d) (Count 1), and conspiracy to commit murder for the purpose of maintaining and increasing his position in the Latin Kings, an enterprise engaged in racketeering activity, in violation of 18 U.S.C. § 1959(a)(5) (Count 6).[1] The defendant pleaded guilty to the racketeering conspiracy charged in Count 1. R. 260. The sentenced imposed by the Court must reflect the seriousness of the defendant's conduct and serve to further the goals of sentencing as outlined in 18 U.S.C. § 3553(a). For the reasons set forth below, the government respectfully submits that a sentence at the low end of the applicable

---

[1] The indictment in this case contains nineteen counts; however, the defendant is only charged in Counts One and Six.

1

Guidelines range will achieve both of these objectives.[2]

## THE PRESENTENCE INVESTIGATION REPORT

### A. Defendant's Total Offense Level

The government agrees with Probation's calculation of the defendant's total offense level as a level 33, as set forth in the Supplemental Presentence Investigation Report (Supp. PSR), with one caveat. Supp. PSR at pp. 1-6. Specifically, Probation reduced the defendant's total offense level by 3 points, pursuant to §§ 3E1.1(a) & (b), for acceptance of responsibility. Supp. PSR at p. 6. While the government agrees that, to date, the defendant has done nothing to negate his acceptance of responsibility, the government reserves the right to contest the reduction depending on what position the defendant takes at the sentencing hearing.

More specifically, as noted in the PSR, the defendant pleaded guilty pursuant to a plea declaration in which he admitted his membership in the enterprise and admitted that the enterprise engaged in racketeering activity, namely, extortion. PSR at ¶¶ 3 & 16. The government recognizes that, while the defendant's plea declaration said nothing about the violence he and his co-defendants were responsible for and admitted just enough to satisfy the requirements of Federal Rule of Criminal Procedure 11, the defendant is not required to affirmatively admit or volunteer relevant conduct in order to receive a reduction for acceptance of responsibility. *See* § 3E1.1, n. 1(A). That being said, Application Note 1(A) also states "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." § 3E1.1, n. 1(A); *see also e.g., United States v. Bailey*, 97 F.3d 982, 986 (7th Cir. 1996) (affirming denial of acceptance for defendant who pleaded

---

[2] As set forth below, the government's position is that the applicable Guidelines range is 151 to 188 months' in prison.

guilty) (internal citations omitted).

As set forth in detail the government's version of the offense and the PSR, and as reflected in the defendant's Guidelines calculations, the defendant participated in a racketeering conspiracy that involved racketeering acts beyond extortion, namely, acts and threats of murder, arson, and assault. As evidenced by the defendant's agreement with the Supp. PSR's advisory guideline calculation, R. 416 at 3 & 5, it does not appear the defendant is contesting that he and his co-conspirators engaged in these additional racketeering acts. At sentencing, however, these additional racketeering acts will be discussed in detail, so the government wishes to preserve the right to ask the Court, consistent with the law in this Circuit, to deny a reduction for acceptance of responsibility should the defendant deny or minimize his role in the offense.

### B. Defendant's Criminal History Category

The government disagrees with Probation's calculation of the defendant's criminal history score as zero and his criminal history category as I. PSR ¶ 74 & 76. As set forth in the PSR and the government's version of the offense, on or about July 19, 2012, the defendant was sentenced to 18 months' probation after being convicted of unlawful possession of a firearm. PSR ¶ 74. Probation did not assign any criminal history points for this sentence because the defendant was arrested "in the vicinity of the defendant's reported security posting area in Maywood," and officers arrested the defendant after receiving complaints "regarding drug activity and street gang loitering." PSR ¶ 74. Therefore, Probation concluded, "[a]bsent additional information and based on a preponderance of the evidence, the undersigned has determined that this case should be considered as relevant conduct to the instant offense." PSR ¶ 74.

The defendant, in his sentencing memorandum, agreed with Probation's decision not to

award the defendant any criminal history points for this conviction, also arguing that the conviction is relevant conduct to the racketeering conspiracy. In support of his argument, the defendant cited to Chapter 4 of the Sentencing Guidelines and *United States v. Nance,* 611 F.3d 409, 413 (7th Cir. 2010). *See* R. 416 at p. 4-5; *see also Nance,* 611 F.3d at 412-13 ("[W]hen calculating a defendant's criminal history, a district court ordinarily cannot consider previous sentences for acts that qualify as relevant conduct.").

Both the defendant's and Probation's reasoning fail for two reasons. First, there is nothing in the record to support or explain how the defendant's previous conviction was relevant to his racketeering offense. In fact, Probation notes that the conduct comprising the conviction at issue occurred prior to the defendant's self-admitted membership in the Latin Kings. PSR ¶ 74.

Second, even assuming that the defendant's prior conviction and sentence resulted from relevant conduct, his sentence should still be counted in his criminal history calculation because "RICO presents an exception to the general rule of § 4A1.2(a)(1)." *United States v. Morales,* 655 F.3d 608, 639 (7th Cir. 2011) (internal quotations omitted). The guidelines relevant to a RICO conviction expressly recognize that a defendant may be convicted of racketeering based in part on conduct for which he has already been convicted and sentenced. *See* § 2E1.1, n. 4. In such a case, if "the previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense" the previously imposed sentence is treated "as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense." *Id.* Because the defendant was personally active in the racketeering conspiracy after the date of his unlawful possession of a firearm conviction in July 2012, he receives one criminal history point for this sentence, pursuant to § 4A1.2(d)(2)(B).

4

Additionally, the defendant committed part of the instant offense while under a criminal justice sentence, namely, the sentence imposed for his July 2012 conviction. As a result, the defendant receives two criminal history points, pursuant to § 4A1.1(d). Therefore, the defendant's total criminal history points equal three and his criminal history category is II.

### C. Defendants' Advisory Guidelines Range

A total offense level 33, combined with a criminal history category II, results in an advisory Guidelines range of 151 to 188 months' in prison.

## SENTENCING MEMORANDUM

### I. A Sentence at the Low End of the Guidelines is Sufficient, But Not Greater Than Necessary.

As the Court is aware, sentencing generally has four purposes: retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). The government's position is that the defendant's advisory Guidelines range is 151 to 188 months' imprisonment and that the goals of sentencing, along with the factors outlined in section 3553(a), support a sentence at the low end of the advisory Guidelines range.

### A. The Nature and Circumstances of the Offense, the Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.[3]

The seriousness of the defendant's crime cannot be overstated. As set forth in detail in the government's version of the offense, the defendant was a member in the Latin Kings street gang, a vicious and well-organized enterprise, for at least 4 years. As a member of the Latin Kings, the defendant participated in and agreed to commit unlawful activities in furtherance of the conduct

---

[3] Additional facts regarding the nature and circumstances of the offense are detailed in the government's version of the offense submitted to Probation.

of the Latin Kings, including multiple acts involving murder, arson, extortion, and assault. Through his participation in the Latin Kings, the defendant directly contributed to the violence that permeates the streets of Chicago and caused devastating harm to countless individuals. The sentence imposed must reflect both the gravity of the defendant's conduct and the magnitude of the harm he caused. Finally, the sentence imposed must provide just punishment. A sentence at the low end of the guidelines accomplishes all of this.

To paint an accurate picture of the seriousness of this offense, it's important for the government to discuss the conduct of the gang in general (and specifically as it operated in the defendant's territory), and evidence concerning the defendant's individual role in the offense.

1. **Gang Structure**

The Latin Kings operated in various parts of Illinois, including Chicago. The gang was highly organized and hierarchical, with its own constitution, manifesto, and code of conduct, as well as its own colors, handshake, salute, emblems, signs, flag, and territories. Territories were divided into "regions," which were further divided into "sections" (sometimes called "chapters"). The highest-ranking member of a section is the "Inca," and the second highest-ranking member is the "Cacique." Below the "Cacique" is the "Chief Enforcer" and the "Enforcer."

There were several regions of the Latin Kings operating in Chicago and the suburbs of Chicago. One such region was the "Midwest" region. Included within the Midwest region was the Maywood section of the Latin Kings, which the defendant joined sometime in 2011. GV Exhibit 2 at 1-2. The defendant was a loyal member of the gang, faithfully fulfilling his duties, which included terrorizing the neighborhood by committing shootings and other acts of violence.

## 2. Gang Rules and Practices and the Defendant's Participation

The Latin Kings had a rigid set of rules and practices, which were contained in the gang's written "manifesto" or "constitution" as well as the Maywood section's local rules. GV Ex. 1. In his role as a member of the Maywood section, the defendant learned these rules and followed them obediently.

### a. Security or "Posting Up"

One of the gang's most important rules required members to protect themselves, other Latin King members, and the gang's territory from its rivals, often through violence. One of the ways the Latin Kings protected their territory was by conducting mandatory "security," which was sometimes referred to as "posting-up." That meant that members patrolled their territory, armed with guns, and were required to shoot to kill any trespassing member of a rival gang, any former member of the Latin Kings not in good standing, and any other individual that posed a threat. Members were required to carry guns when they patrolled in their own territory and when they traveled to rival gang's territory.

The defendant knew this rule and followed it – he participated in security, carried firearms, shot at rival gang members, and was present when other Latin King members shot at rival gang members. For example:

- On or about February 28, 2014, the defendant conducted security with other members of the gang after co-defendant Ulises De La Cruz aka "Pansas," ordered all members to do so and provided them with a firearm. GV Ex. 7, disk 1 at 2:57:46 & disk 2 at 11:01 to 12:01.

- On or about April 25, 2014, the defendant conducted security with other members near 6th Avenue and Lake Street in Maywood. While on security, the defendant acted as "bait" for rival gang members, while other members waited nearby with a .45 caliber pistol and a .22 caliber pistol ready to shoot the rival gang members. GV Ex. 10.

- On July 25, 2014, the defendant conducted security on 22nd street (between Lake and Main) with other members of the gang. GV Exs. 8 at 2:06:46 & 9. During security, the members took turns holding a firearm – a Desert Eagle 9mm pistol that belonged to co-defendant De La Cruz, who was incarcerated at the time. At some point, the members saw a car full of rival gang members drive through the area. The members ran into the street and started yelled "King love" and then one of the members, later identified as co-defendant Eduardo Hernandez aka "Lurch," began yelling "5-0." Co-defendant Efrain Medina aka "Bowser" was carrying the firearm when the rival gang members were spotted, but he failed to shoot at the passing vehicle. In response, co-defendant Ruben Moreno aka "Terrorist" complained, "we could have merked [killed] 'em." GV Ex. 8 at 2:06:46.

- On August 26, 2014, the defendant and other members of the gang, including co-defendants Medina, Oscar Ortiz aka "Thirsty," and Edgar Valarde-Saldana aka "Chapo," conducted security outside co-defendant Jose F. Hernandez's aka "Nene's" residence located at 305 North 6th Avenue because high-ranking members were there that night. The defendant stood directly outside Nene's house and carried a loaded .45 pistol. GV Exs. 5 & 6.

### b. Standing Orders to Shoot (SOS)

Another method the gang used to protect themselves and their power was by issuing standing orders to shoot (also known as "SOS" orders) and beat rival gang members and former Latin King members, also known as "runaways," and by ordering "burns," "hits," and "missions," which were one-time orders to shoot and beat specific rival gang members and runaways.

The defendant was aware of this rule, agreed to participate, and did participate in SOS orders, "burns," "hits," and "missions." For example:

- In or around March 2013, the defendant was ordered to find and shoot a rival gang member, which he did. GV Ex. 2 at 5. According to the defendant, the shooting took place near 7th Avenue and Huron Street. The defendant missed the intended target and almost shot an innocent man standing in the area. *Id*.

- On or about July 6, 2014, the defendant attended a gang meeting during which co-defendant David Perez aka "Monster" ordered multiple members of the gang to locate and shoot several rival gang members. GV Ex. 13 at 14-18. At one point during the meeting, the defendant told one of the assigned shooters where to look for rival gang members to shoot, GV Ex. 14, disk 1, "0008.wav" at 43:40 to 44:33:

8

| | |
|---|---|
| Perez: | (talking to one of assigned shooters) **Look for some Morenos [Black gang members] and air 'em out [shoot them]**. |
| **VILLAGRANA**: | **Look at, ah, Mannheim and Fullerton and if they don't have it there [UI] across the tracks**. |
| Perez: | You guys stay right here. I'm gonna go drop these brothers off. **I'm gonna go pick up some shells and see what other banger [gun] we're gonna grab** and we'll go do that shit. Alright. |

- In or around September 2014, co-defendant Perez ordered the defendant to shoot a member of the Vice Lords street gang by Peewee's Day Care near 6th Avenue and Lake Street. GV Ex. 2 at 6. The defendant was holding the gun at the time and was stationed outside with co-defendant Medina. Instead of doing the shooting himself, the defendant gave the gun to co-defendant Ortiz, who gave the gun to co-defendant Valarde-Saldana to commit the shooting. Valarde-Saldana took the firearm and shot the Vice Lord in the shoulder and after the shooting everyone, including the defendant, fled. *Id*.

- On or about September 18, 2014, the defendant participated in another shooting involving a member of the Vice Lords street gang. GV Ex. 12, disks 1 & 2. Specifically, after a fight ensued, the defendant retrieved a .38 caliber pistol and began arguing with Valarde-Saldana about who was going to shoot the Vice Lord. Valarde-Saldana grabbed the gun and started running toward Lake Street and 6th Avenue to find the Vice Lord. The defendant followed so he could watch the shooting. Valarde-Saldana located the Vice Lord and fired several rounds at him. Fortunately, no one was hurt. Following the shooting, the defendant and the other members of the gang fled the area.

### c. Violations

The gang's rules also required violence against fellow Latin King members. For example, new recruits were initiated into membership through violent beatings. In addition, the rules provided for mandatory beatings or "violations" for any member who broke the rules or failed to follow orders. The message was clear: disobedience would not be tolerated.

While a member of the Latin Kings, the defendant participated in numerous brutal beatings of members who violated rules, failed to obey orders, or questioned authority, including the following:

- 45 second violation of co-defendant Medina for not attending gang meetings

- 1 minute violation of co-defendant Ellezer Torres aka "Bad Boy" for joining the Maywood section of the gang

- 1 minute and 45 second "head to toe" violation of co-conspirator "Scooby" for re-joining the gang

- Violation of co-defendant Valarde-Saldana for "reckless actions"

- 1 minute and 30 second violation of Latin King A for failing to attend gang meetings

*See* GV Ex. 2 at 4-5; GV Ex. 3 at 15:15.

### d. Other Acts of Violence

In addition to the above shootings and acts of violence, on or about July 12, 2014, the defendant and other members of the Latin Kings set fire to a vehicle belonging to a member of the Imperial Gangsters – a rival street gang. GV Ex. 2 at 6, GV Ex.13 at 24-26, GV Ex. 18 at 11-12. More specifically, codefendant Perez ordered the defendant, along with other members of the gang, to drive to the house of an Imperial Gangster located on 17th Avenue and Main Street in Melrose Park and burn down his suburban. Before leaving to commit the arson, one of the gang's leaders gave the defendant gloves and ski masks to use during the arson. As instructed, the defendant and the other members assigned to commit the arson drove to the Imperial Gangster's residence, put on the facemasks and the black latex gloves and lit the rival gang member's car on fire. The defendant was carrying a .380 caliber pistol.

What these rules and practices make clear is that violence, shootings, and death were a day-to-day part of the Latin King lifestyle. A lifestyle that members were expected to embrace and

adhere to. *See* GV Ex. 1 "Membership" ("Membership shall be available to anyone who is willing to change their lifestyle for the doctrine of Kingism."). As a member of the Latin Kings, the defendant obediently followed these rules and practices. He conducted security, carried firearms, participated in shootings and beatings, and committed other acts of violence, including arson and extortion. Additionally, the defendant's actions undoubtedly encouraged other members of the gang to participate in violence – his words and actions sent a message that violence was the best and only option; a message that violence was part of the Latin King lifestyle that they all agreed to follow.

Almost every day in Chicago an innocent person is caught in the crosshairs of gang violence and shootings. Violence that has created a climate of fear that permeates our streets and paralyzes our citizens. The defendant's conduct has directly contributed to the sad state of our city. Participating in a dangerous and deadly criminal organization through a pattern of violent activity, including murder, arson, assault, and extortion is an extremely serious offense. The nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense, and the need to provide just punishment all support a sentence at the low end of the Guidelines range.

B.   **The History and Characteristics of the Defendant**

The defendant's history and characteristics counsel in favor of a sentence at the low end of the advisory Guidelines range. First, the government recognizes that the defendant withdrew from the Latin Kings sometime in 2015, and agrees with the defendant that the Court should consider that when determining an appropriate sentence. But there is much more for the Court to consider as well, like the fact that the defendant was a member of this violent street gang for at least four

years prior to deciding to leave. Every day for over four years, the defendant made a choice to affiliate with the Latin Kings, to participate in the organization's violent and illegal activities, and to terrorize the very community in which he and his family lived. The defendant's long-standing involvement in this violent organization was deliberate and represented a continued choice to affiliate with individuals that commit horrific crimes on a daily basis. The defendant's continued membership in the Latin Kings also belies any suggestion that his membership was the result of a momentary lapse in judgement.

Moreover, while the defendant did make a choice to remove himself from the gang, that doesn't erase all of the harm and pain he caused countless families and the community as a whole during his over four years of membership. The Court must take into account all aspects of the defendant, including the way he spent a significant portion of his later years – as a violent member of a violent, criminal organization that has caused immeasurable harm to the citizens of our city. The defendant's history and characteristics support a sentence at the low end of the Guidelines range.

**C.      The Need to Avoid Unwarranted Sentencing Disparities.**

Sentencing the defendant to a within-guideline sentence will avoid unwarranted sentencing disparities. Fair, appropriate sentences for criminal defendants ranks among the central purposes of the U.S. Sentencing Guidelines. U.S.S.G. Ch. 1, Pt. A at 2. Of course, the Court has no obligation to impose a guideline sentence, given the advisory nature of the Sentencing Guidelines; the applicable Guidelines range is merely a recommendation. That said, the Court must still consider what the Guidelines suggest. *United States v. Nania,* 724 F.3d 824, 830 (7th Cir. 2013). When formulating the Guidelines range applicable to specific offenses, the Sentencing

Commission considers and accounts for nationwide sentencing statistics to ensure that a sentence within the applicable Guidelines range does not create an unwarranted disparity. To be sure, the Seventh Circuit has repeatedly stated that it gives the Sentencing Commission's views on the appropriate sentencing range such credit that it has consistently held a within-Guidelines sentence necessarily takes into account unwarranted disparities. *Id.* at 840.

A sentence of 151 to 188 months' imprisonment is indeed a long and significant sentence, and one that the government does not recommend lightly, but by actively participating in an organization that committed such atrocious crimes, the defendant earned each and every guideline enhancement applicable to his offense level. Careful consideration of the factors set forth in § 3553(a) reinforces that a sentence at the low end of the advisory Guidelines range is appropriately severe.

Additionally, a sentence at the low end of the Guidelines range would avoid unwarranted sentencing disparities with other defendants in this case. The Court sentenced codefendant De La Cruz to 210 months' in custody. R. 320. De La Cruz, like the defendant, pleaded guilty to the racketeering conspiracy charged in Count 1. De La Cruz, however, was a member of the gang for approximately 10 years, held a leadership position, and didn't withdraw from the gang. Sentencing the defendant to a term of imprisonment at the low end of the applicable Guidelines range, a sentence that is approximately five years less than the sentence received by De La Cruz, is proportionate and appropriate given their respective roles in the offense, and will serve to avoid unwarranted sentencing disparities.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court sentence the defendant to a sentence at the low end of the advisory Guidelines range.

Respectfully submitted,

JOHN R. LAUSCH JR.
United States Attorney

By:   /s Jennie Levin
JENNIE LEVIN
Assistant United States Attorney
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 353-5372